IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

POTOMAC RIVERKEEPER, INC., *et al.*,

                                   *

     Plaintiffs,                    *

      v.                           *       CIVIL NO. RDB 04-3885

UNITED STATES ENVIRONMENTAL   *
PROTECTION AGENCY,

                                     *

     Defendant,                   *

and                                    *

MARYLAND ASSOCIATION OF
MUNICIPAL WASTEWATER AGENCIES,   *

                                     *

     Defendant-Intervenor.        *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>MEMORANDUM OPINION</u>

Before this Court are cross motions for summary judgment filed by Plaintiffs Potomac Riverkeeper, Inc., Assateague Coastal Trust. Inc., Chester River Association, Inc., and South River Federation, Inc., (collectively "Plaintiffs") and Defendant-Intervenor Maryland Association of Wastewater Agencies ("MAWA").  Defendant Environmental Protection Agency ("EPA") has filed a Motion to Dismiss, or in the alternative, for Summary Judgment.[1]  In addition, the State of Maryland, Department of the Environment ("MDE") submitted an amicus curiae brief in this case.  This action succeeds a consolidated case originally filed in this Court in

---

[1]  EPA and MAWA are collectively referred to as "Defendants".

1997, *Sierra Club v. EPA*, WMN 97-3838[2], which addressed many of the same matters,

concerning the interaction between EPA and the State of Maryland under the Federal Water

Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251, *et seq*, that are again

at issue in the present case.

Plaintiffs filed this action on December 10, 2004 and were given leave to amend their

Complaint on March 25, 2005.  In their Amended Complaint, Plaintiffs allege that EPA has

failed to comply with its statutory mandates to oversee the timely development of Total

Maximum Daily Loads ("TMDLs") by the State of Maryland, which has allegedly failed to

comply with the Clean Water Act.  In their seven count Amended Complaint, Plaintiffs seek

review of various EPA actions pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 551, *et seq.* and request that this Court enter a declaratory judgment and provide injunctive

relief.  In particular, Plaintiffs challenge alleged final agency action by EPA under § 706(2)(A)

of the APA.

The issues have been fully briefed and no hearing is necessary.  (*See* Local Rule 105.6.)

For the reasons stated below, Defendant EPA's Motion to Dismiss, or in the alternative for

Summary Judgment, is GRANTED, Defendant-Intervenor MAWA's Motion for Summary

Judgment is MOOT, and Plaintiffs' Motion for Summary Judgment is DENIED.

## BACKGROUND

Plaintiffs Potomac Riverkeeper, Inc., Assateague Coastal Trust. Inc., Chester River

Association, Inc., and South River Federation, Inc. are all non-profit environmental membership

---

[2] As discussed *infra* this action was resolved on summary judgment in *Sierra Club v. EPA*, 162 F. Supp. 2d 406 (D. Md. 2001).

organizations.  Plaintiffs contend that the State of Maryland, in particular the Maryland

Department of the Environment ("MDE"), has not carried out its responsibility to develop total

maximum daily loads ("TMDLs") for impaired waterways in Maryland.  Plaintiffs assert that, as

a result, EPA should have taken over these responsibilities and established TMDLs in lieu of

Maryland.  Plaintiffs argue that this reassignment of responsibility is necessary because MDE is

developing TMDLs at a pace and in an order that are unacceptable and inadequate.

As previously noted, this case involves compliance with the Clean Water Act, 33 U.S.C.

§§ 1251, *et seq*.  The objective of the Clean Water Act "is to restore and maintain the chemical,

physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Congress

determined that the states are primarily responsible for achieving the Act's objective, *see* U.S.C.

§ 1251(b), even though the states' actions are subject to EPA approval.  *See generally* 33 U.S.C.

§ 1313.  To meet its objective, the Clean Water Act, by necessity, is both comprehensive and

complex.

Plaintiffs' contentions in this case relate to water quality limited segments ("WQLS") -- a

segment where it is known that water quality does not meet applicable water quality standards,

and/or is not expected to meet applicable water quality standards, even after the application of

the technology-based effluent limitations.  40 C.F.R. § 130.2(j).  WQLS's are required to be

listed on what are referred to as § 303(d) lists.  The Clean Water Act requires, pursuant to §

303(d)(1), that *every state* identify those waters within its boundaries that do not meet, or are not

expected to meet, their established water quality standards even after the imposition of various

enumerated controls and treatments.  *See* 33 U.S.C. § 1313(d)(1); *Sierra Club v. EPA*, 162 F.

Supp. 2d 406, 411 (D. Md. 2001).  Waters identified on these § 303(d) lists are to be ranked

according to priority for treatment based on designated uses for the water and the severity of its

impairment.  33 U.S.C. § 1313(d)(1)(A).

As outlined by Judge Nickerson of this Court in *Sierra Club v. EPA*, 162 F. Supp. 2d

406, 412 (D. Md. 2001):

> Upon submission of the list, the Regional Administrator "shall either approve or disapprove" the list "not later than thirty days after the date of submission."  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).  The list *shall* be approved only if it meets the requirements of 40 C.F.R. § 130.7(b). [FN3]  40 C.F.R. §130.7(d)(2) (emphasis added).  If the Regional Administrator disapproves the 303(d) list submission, then he shall, "not later than thirty days after the date of such disapproval identify such waters in such state."  33 U.S.C. § 1313(d)(2); 40 C.F.R. § 130.7(d)(2).
>
> Fn3  Section 130.7(b) requires states to: identify the WQLSs [water quality limited segments] within their boundaries that still require TMDLs and that will not meet water quality standards even after various enumerated pollution control regulations are imposed or that will not protect indigenous shellfish, fish, and wildlife even after various enumerated thermal discharge limitations are imposed[;] . . . rank these WQLSs according to priority, taking into account the severity of the pollution and the uses to be made of the water[;] . . . identify the pollutants causing or expecting to cause violations of water quality standards[;]   . . .identify specifically those waters targeted for TMDL development in the next two years[;]  . . . assemble and evaluate all existing and readily available water quality-related data in developing this list . . . [;] and, . . . provide certain specified documentation to EPA in support of its decision to list or not to list its waters. *American Canoe Ass'n, Inc. v. EPA,* 30 F. Supp. 2d 908, 918 (E.D. Va. 1998).

For each WQLS identified by a state, the state is required to develop a pollutant-specific TMDL.

33 U.S.C. § 1313(d)(1)(C).  TMDLs indicate the maximum amount of a pollutant or thermal

energy that a WQLS can assimilate daily without exceeding water quality standards.  *See* 40

C.F.R. §§ 130.2(e)-(i).

This Court has previously been called upon to address some of these same provisions of

4

the Clean Water Act in *Sierra Club v. EPA*, WMN 97-3838 and, in 2001, Judge Nickerson

decided this case on summary judgment - - *Sierra Club v. EPA*, 162 F. Supp. 2d 406 (D. Md.

2001).  In that case, plaintiffs, consisting of various non-profit environmental groups, alleged

that EPA abused its discretion in approving Maryland's 1996 and 1998 § 303(d) lists because the

lists did not include all impaired waters.  This Court held that plaintiffs failed to demonstrate that

EPA's acceptance of the justifications offered by Maryland were unreasonable and, therefore,

EPA's decision to approve these lists was upheld.  This Court also held that EPA's approval of

Maryland's § 303(d) and TMDL submissions was not EPA rulemaking and, therefore, EPA was

not required to provide for public notice and comment.

　　This Court further held that EPA did not have a nondiscretionary duty to establish

TMDLs for Maryland and that EPA's 1999 determination not to establish TMDLs for Maryland

was reasonable.  In reaching this decision, the Court rejected plaintiffs' contention that

Maryland's past non-compliance with the Clean Water Act triggered a duty requiring EPA to

step-in and develop TMDLs in Maryland.  *See id.* at 148.  The Court also rejected plaintiffs'

challenge to the length of the schedule approved by EPA for Maryland's TMDL development,

finding that this approval did not constitute an abuse of discretion.  *See id.* at 149.  In addition,

the Court ordered EPA to approve or disapprove Maryland's continuing planning process

("CPP"), which will be discussed in more detail below.[3]

　　On November 1, 2004, EPA completed a thorough re-evaluation of Maryland's TMDL

---

[3] The Court also ruled on a claim brought under the Endangered Species Act ("ESA"),
16 U.S.C. § 1531, *et seq.*, which is not at issue in the present case.

program.[4]  Based on this review EPA determined that Maryland had made significant progress in developing its TMDL program over the past six years, that the State was committed to the program, and that there was no need for EPA to take over the program from Maryland.  (*See* Administrative Record ("AR") 1.)  About a month later, Plaintiffs filed this action on December 10, 2004.

Plaintiffs' seven count Amended Complaint, which was amended on March 25, 2005, seeks for this Court to declare that EPA has violated the APA by approving certain Maryland Department of the Environment ("MDE") actions that violate the Clean Water Act.  Plaintiffs' also seek, in addition to attorneys fees and costs, for this Court to order:

1.   that EPA address and resolve all high-priority impairments within five years of listing or less and all other impairments within eight to thirteen years of listing or less, including the development of TMDLs for impairments requiring TMDLs;

2.   that EPA establish a schedule for addressing and resolving all impairments no later than three months from the date of the Court's order.  Such schedule should require EPA to address and resolve all high-priority impairments within five years of listing or less and all other impairments within eight to thirteen years of listing or less;

3.   that EPA either ensure that the MDE implements the above mentioned schedule and TMDL development in federal and state point and non-point source control programs or withdraw its delegation of authority to Maryland to implement the NPDES[5] Permit Program, issued pursuant to 33 U.S.C. § 1342(b); and

4.   that EPA review the MDE's 2001 CPP to ensure that the CPP is consistent with EPA's new schedule of addressing and resolving impairments no later than two months from the date of the Court's order.

------

[4]  The Re-Evaluation was dated October 29, 2004, but the cover letter transmitting it from EPA to MDE was dated November 1, 2004.  (Am. Compl. at Ex. D; Administrative Record "AR" 1.)

[5]  National Pollution Discharge Elimination System or "NPDES"

(*See* Am. Compl. ¶¶ 103-109.)

STANDARD OF REVIEW

A.  Administrative Procedure Act, 5 U.S.C. §§ 551, *et seq.*

Section 706 of the APA outlines the "scope of review" that the judiciary is to undertake when reviewing a challenged agency action.[6]

Section 706 states:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B) contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.  In this case, Plaintiffs seek review of EPA's actions pursuant to § 706(2)(A).

The APA's standard of review is highly deferential and the agency's action enjoys a presumption of validity.  *See Trinity American Corp. v. EPA*, 150 F.3d 389, 395 (4th Cir. 1998) (citing

---

[6]  "Agency Action" includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act.  5 U.S.C. § 551(13).

*Natural Resources Defense Council, Inc. v. EPA,* 16 F.3d 1395, 1401 (4th Cir. 1993)); *Sierra Club v. EPA*, 162 F. Supp. 2d 406, 411 (D. Md. 2001).  The plaintiff bears the burden of overcoming this presumption and illustrating that the agency action was invalid.  *Sierra Club*, 162 F. Supp. 2d at 411 (citing *Natural Resources Defense Council, Inc. v. Fox,* 93 F. Supp. 2d 531, 538 (S.D.N.Y. 2000); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C. Cir.1981)).

A court must uphold an agency action unless the plaintiff shows that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Trinity American Corp.,* 150 F.3d at 395 (quoting 5 U.S.C. § 706(2)(A)).  The Supreme Court has stated that in determining whether an agency action is arbitrary and capricious, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . .  Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  "An agency decision is deemed to be arbitrary, capricious, [and] an abuse of discretion if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Sierra Club*, 162 F. Supp. 2d at 411 (internal citation and quotation omitted).

Furthermore, generally an agency action must be *final* for a court to have jurisdiction to review the agency action pursuant to the APA.  *See Bennett v. Spear*, 520 U.S. 154, 177-78

8

(1997) ("First, the action must mark the consummation of the agency's decisionmaking process -
- it must not be of a merely tentative or interlocutory nature. And second, the action must be one

by which rights or obligations have been determined, or from which legal consequences will

flow."); 5 U.S.C. § 704.  In addition, a Court's review of an agency action is generally confined

to the administrative record.  *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (" . . .

the focal point for judicial review should be the administrative record already in existence, not

some new record made initially in the reviewing court."); *Fort Sumter Tours, Inc. v. Babbitt*, 66

F.3d 1324, 1335 (4th Cir. 1995) (citing *Fayetteville Area Chamber of Commerce v. Volpe,* 515

F.2d 1021, 1024 (4th Cir. 1975)) ("Judicial review of administrative action is generally confined

to the administrative record.").  When a court finds that an agency action is invalid, "the court's

power is limited to vacating the unlawful agency action and remanding the matter to the agency

for further proceedings . . . ."  *Sierra Club*, 162 F. Supp. 2d at 411 (internal citations omitted).

B.  Subject Matter Jurisdiction

As noted above, for a court to have jurisdiction to review an agency action, the action

must be final.  *See* 5 U.S.C. § 704[7]; *see also Lujan v. National Wildlife Federation*, 497 U.S.

871, 882 (1990) ("When, as here, review is sought not pursuant to specific authorization in the

substantive statute, but only under the general review provisions of the APA, the 'agency action'

---

[7]  This section entitled "Actions reviewable" states:
"Agency action made reviewable by statute and final agency action for which there is no other
adequate remedy in a court are subject to judicial review. A preliminary, procedural, or
intermediate agency action or ruling not directly reviewable is subject to review on the review of
the final agency action. Except as otherwise expressly required by statute, agency action
otherwise final is final for the purposes of this section whether or not there has been presented or
determined an application for a declaratory order, for any form of reconsideration, or, unless the
agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an
appeal to superior agency authority."

in question must be 'final agency action.'") (citing 5 U.S.C. § 704). "As the Supreme Court has

instructed, an agency action may be considered 'final' only when the action signals the

consummation of an agency's decisionmaking process *and* gives rise to legal rights or

consequences." *Comsat Corp. v. National Science Foundation*, 190 F.3d 269, 274 (4th Cir.

1999) (citing *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). When subject matter jurisdiction

is challenged under Federal Rule of Civil Procedure 12(b)(1), the plaintiff has the burden of

proving that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th

Cir. 1999) (*citing Richmond, Fredericksburg & Potomac R. Co. v. United States,* 945 F.2d 765,

768 (4th Cir. 1991)).[8] If a plaintiff cannot demonstrate that an agency action is final, a court

cannot review the action and must dismiss the claim for lack of subject matter jurisdiction. *See*

*Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (dismissing a claim

against a federal agency under 12(b)(1) for lack of jurisdiction when no final agency action was

found to have occurred); *Flue-Cured Tobacco Cooperative Stabilization Corp. v. EPA*, 313 F.3d

852, 857 (4th Cir. 2002) ("[W]e conclude that the [EPA] [r]eport was not final agency action,

and therefore, [] the district court lacked subject matter jurisdiction to hear plaintiffs' claims.").

C. <u>Legal Sufficiency of the Complaint</u>

Furthermore, when the legal sufficiency of the complaint is challenged under Rule

12(b)(6) motion, the court assumes "the truth of all facts alleged in the complaint and the

existence of any fact that can be proved, consistent with the complaint's allegations." *Eastern*

---

[8] In determining whether jurisdiction exists, "the district court is to regard the pleadings'
allegations as mere evidence on the issue, and may consider evidence outside the pleadings
without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg &
Potomac,* 945 F.2d at 768 (*citing Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir. 1982)).

*Shore Mkts. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).  A Rule 12(b)(6) motion to dismiss "should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief."  *Migdal v. Rowe Price-Fleming Int'l Inc.,* 248 F.3d 321, 325 (4th Cir. 2001).  In reviewing the complaint, the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.  *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

The "Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Rather, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Migdal*, 248 F.3d at 325-26; *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).  However, while "notice pleading requires generosity in interpreting a plaintiff's complaint . . . generosity is not fantasy."  *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 191 (4th Cir. 1998).

D.  <u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)

11

(emphasis added).  In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are material.  *Id.* at 248.  Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The Court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.  In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also EEOC v. Navy Federal Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).

When both parties file motions for summary judgment, as here, the court applies the same standards of review.  *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n.3 (4th Cir. 1983) ("The court is not permitted to resolve genuine issues of material fact on a motion for summary judgment – even where . . . both parties have filed cross motions for summary judgment.") (emphasis omitted), *cert. denied,* 469 U.S. 1215 (1985).  The role of the court is to "rule on each party's motion on an individual and separate basis, determining, in each case, whether a judgment may be entered in accordance with the Rule 56 standard."  *Towne Mgmt. Corp. v. Hartford Acc. & Indem. Co.,* 627 F. Supp. 170, 172 (D. Md. 1985).  "[B]y the filing of a motion [for summary judgment] a party concedes that no issue of fact exists under the theory he is advancing, but he does not thereby so concede that no issues remain in the event his adversary's theory is adopted."  *Nafco Oil & Gas, Inc. v. Appleman,* 380 F.2d 323, 325 (10th Cir. 1967); *see also McKenzie v. Sawyer,* 684 F.2d 62, 68

n.3 (D.C. Cir. 1982).

DISCUSSION

Plaintiffs' Amended Complaint contains the following seven counts: Count I (EPA's Approval of the 2004 Memorandum of Understanding ("MOU")); Count II (EPA's Approval of the MDE's 2004 Workplan); Count III (EPA's Approval of the MDE's 2002 Workplan); Count IV (EPA's Approval of the MDE's 2002 Integrated List); Count V (EPA's Approval of the MDE's Individual TMDLs, Water Quality Analyses, and De-Listings); Count VI (EPA's Approval of the MDE's 2001 Continuing Planning Process ("CPP")); Count VII (EPA's Approval of the MDE's 2004 Integrated List). EPA moves to dismiss Plaintiffs' Amended Complaint for lack of jurisdiction, citing that the majority of the complained of "actions" are not final agency actions reviewable by this Court under the APA. While EPA concedes that the actions complained of in certain Counts could be considered final agency action, EPA contends that Plaintiffs simply fail to challenge the *substance* of those particular actions.

Plaintiffs assert that all of the challenged actions are final agency actions reviewable by this Court. Plaintiffs maintain that the pace and order of addressing TMDLs are substantive issues that should have been considered by EPA prior to its approval of the complained of agency decisions. EPA strongly disagrees with this assertion, stating that pace and order are not part of the review and approval process required by the Clean Water Act. EPA contends that these facts are appropriate considerations only when EPA is determining whether it should take over a TMDL program from a state. In this case, EPA contends that the only final agency action reviewable by this Court, based on Plaintiffs' pace and order contentions, is its November 1, 2004 decision not in intervene and overtake the TMDL program from Maryland. To address

13

each parties' arguments, this Court will analyze each count in turn, coupling certain counts that are closely related.

    A.  <u>Count I</u>

    In Count I, Plaintiffs contend that EPA's "approval of the 2004 MOU [Memorandum of Understanding] was arbitrary, capricious, an abuse of discretion, and not in accordance with the law under section 706(2)(A) of the APA . . . because the MDE's actual pace of addressing and resolving" impairments is too slow.  (Am. Compl. ¶ 65.)  These revisions to the 1998 MOU were approved by EPA on November 1, 2004.  (Am. Compl. ¶ 50 & Ex. D.)[9]  The revisions, among other changes, extend the goal for completing TMDLs from 2008 until 2011.  (Am. Compl. ¶ 51 & Ex. D.)

    EPA contends that Count I must be dismissed because the 2004 MOU revisions do not constitute final agency action subject to judicial review pursuant to § 706(2)(A).  EPA states that the 2004 MOU revisions do not meet the test for finality, in part, because the revisions do not "give rise to legal rights or consequences."  *Comsat*, 190 F.3d at 273; *see also Bennett*, 520 U.S. at 177-78 ("First, the action must mark the consummation of the agency's decisionmaking process -- it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal

_____

    [9]  While the 2004 MOU revisions (identified as Enclosure 1) and EPA's summary of its decision not to take over Maryland's TMDL program (identified as Enclosure 2) were transmitted by the same cover letter, it is clear to the Court that they are two separate documents. (Am. Compl. Ex. D.)  As previously noted, Enclosure 2, "EPA's Periodic Re-Evaluation of Maryland's TMDL Program" is dated October 28, 2004, although EPA has referred to it by the date appearing on the transmittal cover letter from EPA to MDE, which is November 1, 2004. Enclosure 2 does reference EPA's agreement to the MOU revisions set forth in Enclosure 1, but its broader purpose was to summarize its evaluation of Maryland's TMDL program, which naturally includes consideration of MDE's progress in implementing the MOU.

consequences will flow.").  Indeed, section VII of the MOU, which appears in the 1998 version

and was unchanged by the 2004 revisions, states: "This MOU creates no cause of action against

EPA or the State of Maryland beyond those, if any, that may already exists under State or federal

law."  (Am. Compl. Ex. A; *see also* AR 3.)  The MOU further states:

> Nor shall this MOU be construed as creating any night [sic] or benefit
> substantive or procedural, enforceable in law or equity, by any person
> or entity against any of the Parties.  This MOU shall not be construed
> to create any right to judicial review involving the compliance or
> non-compliance with this MOU, nor does it constitute a
> determination on the part of EPA that any particular TMDL is
> required.

(Am. Compl. Ex. A; *see also* AR 3.)

Given this specific language in the MOU, the Court cannot accept Plaintiffs' contention

that it created "rights or obligations . . . from which legal consequences will flow."  *Bennett*, 520

U.S. at 177-78.  Plaintiffs cite *dicta* in *Sierra Club v. EPA*, 162 F. Supp. 2d 406 (D. Md. 2001) to

support their argument that the 2004 MOU revisions create legally actionable obligations.

Interestingly, while addressing the issue of plaintiffs' challenge to EPA's decision not to step in

and establish TMDLs for Maryland, Judge Nickerson considered the creation of the 1998 MOU

as one factor relied upon by EPA in determining not to take over Maryland's TMDL program.

In a footnote, Judge Nickerson noted:

> Plaintiffs make much of the fact that the MOU is not enforceable. Yet,
> Plaintiffs have made no allegations that, since the MOU was signed in
> November 1998, Maryland or the EPA have not abided by its terms.  In
> addition, if Maryland does not fulfill its obligations under the MOU,
> Plaintiffs are free to bring suit to require compliance.

*Sierra Club*, 162 F. Supp. 2d at 417 n.15.  Quite simply, in *Sierra Club*, Judge Nickerson was not

required to conduct the type of analysis outlined in *Bennett*[10] and *Comsat*[11] to determine whether the MOU itself constituted a final agency action. After considering the factors identified in *Bennett* and *Comsat*, this Court finds that the 2004 MOU revisions do not constitute final agency action. Therefore, Count I is dismissed, pursuant to Rule 12(b)(1), for lack of jurisdiction.

B. Count II and Count III

In Count II and Count III, Plaintiffs contend that EPA's approval of the MDE's 2004 Workplan and the approval of the MDE's 2002 Workplan, respectively, were both arbitrary, capricious, an abuse of discretion, and not in accordance with § 706(2)(A) of the APA. (Am. Compl. ¶ 75 & ¶ 83.) EPA contends that Counts II and III must be dismissed because Workplans do not constitute final agency action subject to judicial review pursuant to § 706(2)(A).

Workplans are prepared pursuant to the MOU. (*See e.g.*, AR 138, Letter from MDE to EPA enclosing Workplan pursuant to the MOU.) As a result, Counts II and III fail for the same reason as Count I. Any EPA approval of Workplans submitted by MDE pursuant to the MOU do not constitute a final agency action, under the APA, and, therefore, Counts II and III are dismissed, pursuant to Rule 12(b)(1), for lack of jurisdiction.

C. Count IV, Count V, and Count VII

In Count IV and Count VII, Plaintiffs contend that EPA's approval of the MDE's 2002 Integrated List and its 2004 Integrated List, respectively, were arbitrary, capricious, an abuse of discretion, and not in accordance with § 706(2)(A) of the APA because the MDE's actual pace

---

[10] *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

[11] *Comsat Corp. v. National Science Foundation*, 190 F.3d 269, 274 (4th Cir. 1999).

of resolving impairments was too slow.  (Am. Compl. ¶ 85  & ¶ 99.)  The Integrated Lists, also

referred to as § 303(d) lists, include all water quality limited segments ("WQLS") within a

state's boundaries.  *See* 33 U.S.C. § 1313(d)(1).  Waters identified on these § 303(d) lists are to

be ranked according to priority for treatment based on designated uses for the water and the

severity of its impairment.  33 U.S.C. § 1313(d)(1)(A).  Plaintiffs contend that MDE's historic

average number of impairments resolved per year, if continued, would translate to an

unacceptable time for TMDL completion – not until the 2030's.  (Am. Compl. ¶ 85 & ¶ 99.)

Furthermore, Plaintiffs assert that the MDE has failed to address impairments in the proper order

of priority.  (Am. Compl. ¶ 88 & ¶ 102.)

     In Count V, Plaintiffs contend that EPA's approval of the MDE's individual TMDLs,

water quality analyses, and de-listings were arbitrary, capricious, an abuse of discretion, and not

in accordance with § 706(2)(A) of the APA.  (Am. Compl. ¶ 90.)  Similarly, Plaintiffs contend

that EPA's implicit "approval" of the pace and priority of TMDL completion makes EPA's

approval of the submissions listed in Count V arbitrary and capricious.  (*See* Am. Compl. ¶¶ 91-

95.)

     EPA concedes that the approvals described in Counts IV, V, and VII can be considered

final agency actions.  EPA, however, asserts that these Counts fail because the complained of

behaviors – slow pace and improper prioritizing – fall outside the parameters properly reviewed

by EPA prior to approval of these types of submissions.  In contrast, if Plaintiffs were

complaining that EPA's approval of a § 303(d) list was improper because the list omitted a

certain water, EPA's § 303(d) list approval would be a reviewable final agency action.  *See e.g.,*

*Sierra Club*, 162 F. Supp. 2d at 413 ("Plaintiffs allege that the EPA abused its discretion in

approving Maryland's 1996 and 1998 § 303(d) lists because the lists do not include all impaired

waters.").  The gravamen of EPA's argument, and Plaintiffs' strong disagreement, is that EPA is

not required to consider matters of timing and priority when approving § 303(d) lists, specific

TMDLs, water quality analyses, and de-listings.  Given EPA's concession that the approvals

addressed in Counts IV, V, and VII are final agency actions, this Court has jurisdiction over

these claims.  Therefore, EPA's motion to dismiss these claims shall be examined pursuant to

Rule 12(b)(6), for failure to state a claim upon which relief can be granted, as the Court need not

consider material outside of the pleadings to resolve certain purely legal issues.[12]

To determine the required scope of EPA's review of the above referenced submissions,

the Court must look to the appropriate statutes and regulations promulgated thereunder.  First,

nothing in 33 U.S.C. § 1313(d) ("Identification of areas with insufficient controls; maximum

daily load; certain effluent limitations revision") specifically references any type of pacing,

scheduling, or timing related to TMDL *completion* by the state.  Therefore, these factors are not

outlined as ones that must be considered by EPA prior to approving a § 303(d) list, a specific

TMDL, a water quality analysis, or a de-listing.  While 33 U.S.C. § 1313(d)(1)(A) requires

waters to be ranked according to priority for treatment - a requirement that the parties do not

dispute was fulfilled - the provision does not outline any specific time requirements for

*completing* prioritized items.

Second, the EPA regulation addressing TMDLs and individual water quality-based

effluent limitations, 40 C.F.R. § 130.7, does not require the EPA to analyze certain time frames

---

[12]  An issue presented by Count V, however, necessitated consideration of materials
outside the pleadings and, as a result, it was examined pursuant to Rule 56 of the Federal Rules
of Civil Procedure.  *See infra*.

for TMDL *completion* prior to approving a § 303(d) list, a specific TMDL, a water quality analysis, or a de-listing. As previously noted, § 130.7(b) requires states to identify the WQLSs within their boundaries that still require TMDLs and that will not meet water quality standards even after various enumerated pollution control regulations are imposed or that will not protect indigenous shellfish, fish, and wildlife even after various enumerated thermal discharge limitations are imposed. *See* 40 C.F.R. § 130.7(b); *Sierra Club*, 162 F. Supp. 2d at 412 (citing *American Canoe Ass'n, Inc.*, 30 F. Supp. 2d at 918). The Section also requires states to rank these WQLSS according to priority, taking into account the severity of the pollution and the uses to be made of the water and identify the pollutants causing or expecting to cause violations of water quality standards. *See id.* States must also identify specifically those waters *targeted* for TMDL development in the next two years. *See id.*

While a state's § 303(d) list must list waters "targeted" for TMDL development within the next two years, this requirement is a form of goal setting. This requirement does not, however, require EPA, prior to approval, to ascertain, based on the state's historic average number of impairments resolved per year, whether the state can actually *complete* the "targeted" TMDLs in the next two years.[13] In addition, there is no provision that requires EPA to approve

---

[13] Furthermore, Plaintiffs' Amended Complaint, in Counts IV, V, and VII, cites that MDE's actual pace of completing TMDLs thus far, if continued, will not make it compliant with the suggested timetables outlined in the "1997 EPA Guidance". Such a guidance, however, cannot require EPA, prior to approving the submissions mentioned in Counts IV, V, or VII, to speculate future pace of TMDL development based on past pace in order to measure whether MDE is "on target" to meet the suggested timetables in the "1997 EPA Guidance". *See generally Property Owners Ass'n of Deep Creek Lake, Inc. v. Gorsuch*, 601 F. Supp. 220, 223 - 24 (D. Md. 1983) (noting that benchmarks contained in EPA Guidance were "seemingly nothing more than internal, non-binding guidelines used by that agency."); *United States v. Ellen*, 961 F.2d 462, 466 (4th Cir. 1992) (finding that an agency manual is interpretive in nature and not legislative as an exercise of an agency's delegated legislative function).

or disapprove a state's priority rankings.  *See Sierra Club, Inc. v. Leavitt*, 393 F. Supp. 2d 1263,

1273 (N.D. Fla. 2005).

As to Count V, Plaintiffs allege that EPA has approved individual TMDLs for lower

priority impairments before higher priority impairments.  On the issue of priority, §

1313(d)(1)(C) states:

> Each State shall establish for the waters identified in paragraph (1)(A) of this
> subsection, and in accordance with the priority ranking, the total maximum
> daily load, for those pollutants which the Administrator identifies under
> section 1314(a)(2) of this title as suitable for such calculation. Such load
> shall be established at a level necessary to implement the applicable water
> quality standards with seasonal variations and a margin of safety which takes
> into account any lack of knowledge concerning the relationship between
> effluent limitations and water quality.

33 U.S.C. § 1313(d)(1)(C).  Count V of Plaintiffs' Amended Complaint states a claim related to

priority and this Court must look outside the pleadings to address this allegation.  As a result, the

analysis of this issue must be conducted under Rule 56 of the Federal Rules of Civil Procedure.

*See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004); *see also Laughlin v. Metro.*

*Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir.1998).

Plaintiffs' discussion of their TMDL priority argument focuses, once again, on time

limits instead of the actual *priority* in which TMDLs were allegedly improperly approved under

33 U.S.C. § 1313(d)(1)(C) in violation of the APA.  (*See* Pls.' Mnt., p. 27-30.)  Plaintiffs cite no

factual support in the administrative record to advance their priority claim and illustrate that the

EPA acted in a manner that was arbitrary and capricious.  Instead, Plaintiffs focus on evidence

supporting their theory of a two-year *completion* "requirement", which, as noted above, is not

supported by the law.  *See supra* (40 C.F.R. § 130.7(b) containing *targeting* requirement).

In fact, the extensive administrative record in this case does not present facts supporting

20

Plaintiffs' priority claim, as there is a rational basis in the record for EPA to have approved MDE

TMDLs.  The record reflects that EPA considered priority in relation to adjusting the MOU

schedule for completion of  TMDLs.  (*See* AR 7, E-mail from Susan Sciarratta, EPA to Rick

Eskin, MDE; *see also* AR 1 at p. 4; AR 156 (E-mail between EPA and MDE); *see generally* AR

8 (MDE letter discussing priority issues).)  In addition, documents prepared by Plaintiffs

contained in the administrative record illustrate that "in 2002, MDE did a better job of

addressing higher priority impairments."  (AR 6 at p. 10) (containing table of TMDLs over time

and showing that 30% of high priority items were "addressed" while only 4% of medium priority

and 9% of low priority items were addressed.)   Based on this Court's review of the

administrative record, Plaintiffs have failed to show that EPA's decision to approve MDE's

TMDLs was an abuse of discretion in violation of § 706(2)(A) of the APA.

Furthermore, this Court is not persuaded that the cases cited by Plaintiffs (*Idaho

Sportsmen's Coalition v. Browner*, 951 F. Supp. 962 (W.D. Wash. 1996); *Friends of the Wild

Swan, Inc. v. EPA*, 130 F. Supp. 2d 1184 (D. Mont. 1999); *Sierra Club v. Hankinson*, 939 F.

Supp. 865 (N.D. Ga. 1996)) require a different result, as they are not instructive on the precise

issues before the Court in Counts IV, V, and VII.   These cases present different procedural

postures and different factual circumstances than the instant case and, therefore, did not require

the courts to conduct the above analysis.[14]

Count IV and Count VII fail to state a claim because EPA was under no statutory duty to

consider pace and priority prior to approving the § 303(d) lists.  As a result Count IV and Count

VII are dismissed, pursuant to Rule 12(b)(6), for failure to state a claim upon which relief can be

---

[14]  For a discussion of these cases *see* Discussion at § E., *infra.*

granted.  As to Count V, judgment is entered in favor of EPA and against Plaintiffs.[15]

D.  Count VI

In Count VI, Plaintiffs contend that EPA's "decision to continue to approve" Maryland's

2001 Continuing Planning Process document (the "2001 CPP") is a final agency action that is

"arbitrary, capricious, an abuse of discretion, and not in accordance with the law" under 5 U.S.C.

§ 702(2)(A).  (Am. Compl. ¶ 97.)  For reasons stated below, this Court lacks subject matter

jurisdiction over this claim.

The Clean Water Act requires that each state develop a CPP and submit it to EPA for

approval.  *See* 33 U.S.C. § 1313(e)(1) ("Each State shall have a continuing planning process

approved under paragraph (2) of this subsection . . . .").  States were required to submit their

CPPs to EPA for approval no later than 120 days after October 18, 1972, and EPA was required

to approve or disapprove a state's proposed CPP within 30 days.  33 U.S.C. § 1313(e)(1).  After

the initial submission, EPA is required to review a state's CPPs "from time to time" for the

purpose of insuring that it is "at all times" consistent with the Clean Water Act.  33 U.S.C. §

1313(e)(2).  The standards that EPA uses to approve or disapprove CPPs are identified in

regulations.  *See* 40 C.F.R. § 130.5.

In *Sierra Club v. EPA*, Judge Nickerson concluded that EPA had not approved or

disapproved the Maryland's CPP in violation of the Clean Water Act:

> The Court, in its September 13, 2000 Memorandum and Order, found
> that, "at the time Plaintiffs' 1998 complaint was filed, EPA has not
> approved or disapproved the [1986] proposed CPP or any other
> CPP." *Id*. at 13.  EPA has presented no evidence to sway the Court

---

[15]  WAMA's Motion for Summary Judgment on this issue is moot to the extent that it is
duplicative of the EPA's.

> from its previous finding.  Based on this finding, the EPA, pursuant
> to section 1313(e)(2), is to either approve or disapprove Maryland's
> most recent CPP submission within 90 days of the date of this order.

162 F. Supp. 2d at 421 (footnotes omitted).  EPA complied with the Court's order by approving

Maryland's 2001 CPP on December 6, 2001.  (AR 34.)

In their Amended Complaint, Plaintiffs allege that "EPA has neither reviewed nor

disapproved the MDE's CPP since 2001 . . . ."  (Am Compl. ¶ 97.)  In light of this inaction,

Plaintiffs conclude that EPA "should therefore be deemed to approve the 2001 CPP" and assert

that:

> The EPA's decision to continue to approve the 2001 CPP was
> arbitrary, capricious, an abuse of discretion, and not in accordance
> with the law under section 706(2)(A) of the APA, 5 U.S.C. §
> 706(2)(A), because the 2001 CPP does not describe the state's
> current process for implementing its TMDL Program, as required by
> t          h          e                    A          c          t          .

(*Id.*)  The corresponding relief requested by Plaintiffs appears limited to ordering EPA "to

review the MDE's 2001 CPP to ensure that the CPP is consistent with the EPA's new schedule

of addressing and resolving impairments no later than two months from the date of the Court's

Order."  (Am. Compl. ¶ 107.)

This Court lacks subject matter jurisdiction over Plaintiffs' claim because there is no

final agency action for the Court to review.  An agency action must be *final* for a court to have

subject matter jurisdiction to review that action under the APA.  5 U.S.C. § 704; *see Invention

Submission Corp.,* 357 F.3d at 460; *Flue-Cured Tobacco Cooperative Stabilization Corp.*, 313

F.3d at 857.  Notably, the agency action contemplated by Count VI  -- EPA's obligation to

review a state's CPP "from time to time"-- is discretionary.  *See* 33 U.S.C. § 1313(e)(2) ("The

23

Administrator shall from *time to time* review each State's approved planning process for the purpose of insuring that such planning process is at all times consistent with this chapter.") (emphasis added); *American Canoe Ass'n, Inc. v. EPA*, 30 F. Supp. 2d 908, 923 (E.D. Va. 1998) ("[C]ourts have generally held that use of the phrase 'time to time' does not create a nondiscretionary administrative duty.") (citations omitted).  As a result, this Court finds that, by not exercising its discretion to review Maryland's 2001 CPP, EPA neither marked the consummation of a decisionmaking process nor engaged in conduct that gave rise to legal rights or consequences.  *Bennett*, 520 U.S. at 177-78; *Comstat*, 190 F.3d at 273.  Accordingly, Count VI is not directed at final agency action and, as a result, this Court lacks subject matter jurisdiction over this claim under Rule 12(b)(1).

This Court, moreover, rejects Plaintiff's attempt to convert agency inaction into final action by arguing that *not* reviewing or disapproving the 2001 CPP should be deemed as continuously approving the 2001 CPP.  First, Plaintiffs offer no legal support for construing agency inaction as final agency action in this particular context.  Second, allowing such a claim to proceed threatens to dissolve the distinction between 5 U.S.C. § 702(1) (courts may compel agency action that has *not* occurred due to unreasonable delay) and 5 U.S.C. § 702(2)(A) (courts may set aside agency action that *has* occurred because it is arbitrary and capricious).  This Court is simply unwilling to accept that -- in the context of EPA's obligation to review CPPs under the Clean Water Act's "from time to time" provision -- neither reviewing nor disapproving CPPs is the same as continuously approving CPPs.  *Cf. Ecology Center, Inc. v. United States Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999) ("This court has refused to allow plaintiffs to evade the finality requirement with complaints about the sufficiency of an agency action 'dressed up as an

24

agency's failure to act.'" ).

Plaintiffs present an alternative argument for concluding that final agency action

occurred when EPA neither reviewed nor disapproved the 2001 CPP:

> EPA's decision to continue to approve Maryland's CPP is not
> reflected by one act, but flows from a series of agency actions: EPA's
> approvals of the 2004 MOU and the 2002 and 2004 Section 303(d)
> Lists.  With each of these actions, EPA became aware that the 2001
> CPP no longer reflected MDE's TMDL program and violated the
> CWA.  EPA therefore had a duty to review and subsequently approve
> or disapprove Maryland's existing CPP.

(Pls.' Reply, p. 8.) As noted above, however, this Court has already determined that the 2004

MOU did not give rise to rights or obligations from which legal consequences flow.  *See*

Discussion at § A., *supra*.  While the approval of the 2002 and 2004 Section 303(d) Lists does

constitute final agency action, these decisions did not trigger any nondiscretionary obligation

that would have required EPA to review and approve or disapprove the 2001 CPP.  *See* 33

U.S.C. § 1313(e)(2).  As a result, there is no legal basis for Plaintiffs' attempt to derive final

agency action -- in the context of EPA's neither reviewing nor approving the 2001 CPP -- from

the 2004 MOU and 2002 and 2004 Section 303(d) Lists.

This Court notes that Plaintiffs' claim in Count VI is best understood as a claim for

agency inaction under 5 U.S.C. § 702(1), which allows a reviewing court to "compel agency

action unlawfully withheld or unreasonably delayed."  Claims brought under § 702(1), however,

"can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action

that it is *required to take.*"  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004)

(emphasis in original).  As the Supreme Court explained:

> The principal purpose of the APA limitations we have
> discussed—and of the traditional limitations upon mandamus from

25

which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved--which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 67-68.  Even if Plaintiffs had couched Count VI as a claim for agency inaction under § 702(1), however, that claim would fail because it would not seek to compel action that EPA is required to take.  As already noted, EPA's obligation to review a state's CPP "from time to time" is discretionary.  *See American Canoe*, 30 F. Supp. 2d at 923.  The same problem would prevent Plaintiffs from bringing this claim as a Clean Water Act citizen suit.  *See* 33 U.S.C. § 1365(a)(2) (authorizing suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is *not discretionary* with the Administrator.") (emphasis added).[16]

E.   <u>EPA's Decision Not to Take Over MDE's TMDL Program</u>

At a fundamental level, Plaintiffs' Amended Complaint is essentially challenging the *pace* of Maryland's TMDL program and the *priority* accorded to specific waterways by that program.  As EPA points out:

---

[16]  EPA notes that Plaintiffs have a remedy under the APA that would allow them to prompt EPA to review Maryland's 2001 CPP under the Clean Water Act's "time to time" provision.  The APA provides that "[s]o far as the orderly conduct of public business permits, an interested person may appear before an agency . . . for the presentation, adjustment, or determination of an issue, request, or controversy in a proceeding . . . or in connection with an agency function."  5 U.S.C. § 555(b).  The EPA further acknowledges that "action in response [to a petition brought under § 555(b)] would then constitute final agency action that is judicially reviewable under the APA."  (EPA's Mtn, p. 46.)

> There is only one final agency action germane to Plaintiffs'
> fundamental claim that EPA's ongoing approval of Maryland's pace
> of establishing TMDLs is arbitrary, capricious, and not in accordance
> with law.   That action is EPA's November 1, 2004, review of
> Maryland's TMDL program and EPA's decision not to intervene and
> establish TMDLs for the state.

(EPA's Reply, p. 16.)  Although the Court's resolution of this case does not rely on its analysis

of EPA's decision not to take over Maryland's TMDL program, *see* Discussion §§ A.-D., *supra*

(dismissing Plaintiffs' Complaint under Rules 12(b)(1) & 12(b)(6) and entering judgment under

Rule 56), this analysis is arguably warranted under liberal pleading rules and in any event helps

reveal the nature of the true dispute between the parties.  Accordingly, assuming *arguendo* that

EPA's decision not to intervene and establish TMDLs for Maryland is challenged by Plaintiffs'

Amended Complaint, this Court would find that EPA did not abuse its discretion, under the

APA, by deciding not to intervene in Maryland's TMDL program.

On October 28, 2004, EPA memorialized its decision not to take over Maryland's TMDL

program in a document titled "EPA's Periodic Re-Evaluation of Maryland's TMDL Program."

EPA summarized its detailed review of Maryland's TMDL program by noting that:

> MDE has made significant progress in developing and implementing
> its TMDL program over the past six years.   While MDE has
> encountered some challenges, MDE also has developed significant
> knowledge and experience in TMDL development that should enable
> MDE to proceed at a more robust pace in the future.   Maryland's
> commitment of resources and efforts thus far demonstrate that
> Maryland is implementing CWA Section 303(d) in a meaningful way.

(AR 1; *see also* Am. Compl. Ex. D.)  EPA recognized that Maryland "has devoted approximately

40.5 full time equivalent employees to various aspects of TMDL development and

implementation. . . ."  (*Id.*; *see also* MDE's Opp., p. 13)  In addition, EPA emphasized that "the

most efficient and effective approach for the Agency to implement its oversight responsibilities

is to work in partnership with states to assist them in developing state TMDL programs that are consistent with the goals and requirements of the Clean Water Act." (AR 1.) Finally, EPA concluded that "there is no need for EPA to step in and complete TMDLs in Maryland at this time." (*Id.*)

Notably, EPA's 2004 decision not to intervene in Maryland's TMDL program specifically addressed the very issues -- *pace* and *priority* -- which constitute the basis of this case. For example, EPA specifically notes that "MDE has been working to develop methodologies for modeling and establishing complex TMDLs." (AR 1; *see also* AR 7; AR 19 at p. 4; AR 156 (E-mail between EPA and MDE).) After acknowledging that "[t]he resources devoted to developing these methodologies has necessarily taken away from performing the actual analyses," EPA states that "it is expected that MDE will be able to utilize these methodologies to establish more TMDLs more efficiently in the future." (AR 1.) Similarly, the 2004 decision also addresses issues relating to priority:

> With respect to MDE's commitment to begin "addressing" high priority waters within five years and all other segments within ten years, EPA notes that the September 2, 2004 letter defines the term "address" as "beginning work that may include model/method development or monitoring . . . The use of the term "address" in Enclosure C is of particular concern because EPA cannot determine based on Enclosure C which TMDLs will be fully completed in a particular year, as opposed to water quality limited segments as to which monitoring and/or modeling will be commenced. Accordingly, we request that MDE clarify Enclosure C.

(*Id.*);[17] *see also* Discussion § C., *supra* (explaining that the Clean Water Act does not require

---

[17] Plaintiffs emphasize that EPA highlighted a lack of clarity in MDE's draft MOU submission sent to EPA in September, even given MDE's confirmation in the MOU that listings will be completed within 8-13 years in accordance with EPA guidance. As of the filing of EPA's Reply brief, it was still awaiting clarification from MDE on this term. (EPA's Reply, at

*completion* of high-priority items within two years).

Any substantive analysis under the APA of EPA's decision not to take over Maryland's

TMDL program is, of course, inherently fact-intensive:

> Each of the relevant cases around the United States is fact-intensive. And the results have depended, at least in part, on the degree of the states' attempted compliance with TMDL requirements, the EPA's review of the states' filings, and commitments for the future. Except where the states made no filings at all, the courts of this circuit have consistently rejected the "constructive submission" analysis under the CWA. Some courts have found that the EPA acted arbitrarily and capriciously under the standards of the APA.  But again, each decision was fact-intensive.

*San Francisco Baykeeper, Inc. v. Browner*, 147 F. Supp. 2d 991, 1005-6 (N.D. Cal. 2001).

The specific facts reflected in the record here -- including the consideration that EPA accorded

the issues of pace and priority -- distinguish this case from the cases emphasized by Plaintiffs in

the Memorandum in support of their Motion.  As a result, Plaintiffs have not persuaded this

Court that EPA's decision not to intervene in Maryland's TMDL program was invalid under the

standards outlined by the APA.

First, the cases cited by Plaintiffs are marked by egregious failures to comply with the

Clean Water Act.  For example, in *Idaho Sportsmen's Coalition v. Browner*, 951 F. Supp. 962

(W.D. Wash. 1996), the court explained that "[u]nder the *proposed schedule* at least twenty-five

more years would go by before the remaining TMDLs were developed" and noted that "the

twenty-five years could easily turn into fifty or seventy-five."  *Id*. at 967 (emphasis added).

---

12 n.3).  Although Plaintiffs contend that the delay in MDE's response is unacceptable, the Court notes EPA's efforts in seeking appropriate clarification on a topic that relates to the very issues that are the subject of Plaintiffs' lawsuit.  (*See e.g.*, AR 159; AR 160 (MDE e-mail response).) Nonetheless, this issue is not of great import, in light of the totality of factors considered by EPA, and does not sway the Court that EPA's decision was unreasonable.

Similarly, in *Friends of the Wild Swan, Inc. v. EPA*, 130 F. Supp. 2d 1184 (D. Mont. 1999) the court commented that "[a]t its current pace, the state will need over one hundred years to develop the 3000 TMDLs required for the WQLSs identified in 1998." *Id.* at 1196.  Finally, in *Sierra Club v. Hankinson*, 939 F. Supp. 865 (N.D. Ga. 1996), the court noted that "[a]t its current pace, Georgia will take more than one hundred years to comply with the Clean Water Act." *Id.* at 867.

Second, Maryland has complied with TMDL requirements to a degree far greater than the state programs addressed in the above decisions.  Even if this Court accepts Plaintiffs' calculation of Maryland's TMDL completion -- which does not reflect EPA's expert conclusion that the pace of Maryland's implementation will increase over time -- the proposed TMDL completion date is projected to arrive in 2038. (*See* Pls.' Mtn., p. 1.)  Although this date remains some time away, the administrative record reveals that a rational basis exists for EPA's decision in light of Maryland's past conduct, Maryland and EPA's partnership and plans for future compliance with the Clean Water Act, and EPA's reasonable assessment of the state of Maryland's program.  *See Trinity American Corp.*, 150 F.3d at 395 (noting that an agency's action enjoys a presumption of validity under the highly deferential standard of review required by the APA); *Sierra Club*, 162 F. Supp. 2d at 411 (same).  As a result,  this Court finds that Plaintiffs have failed to establish that EPA acted arbitrarily and capriciously under the APA when it decided not to intervene and take over Maryland's TMDL program.[18]  *See id.*; *Cf. Public*

---

[18]  This Court previously reached the same conclusion at a time when Maryland's expertise and efficiency in implementing TMDLs was less developed.  *See Sierra Club*, 162 F. Supp. 2d at 419 ("Because the Court finds that the EPA has not abused its discretion in deciding to leave TMDL implementation in the hands of Maryland, summary judgment in favor of the EPA will be granted. . . .").  (*See also* MDE's Opp., pp. 14-17) (explaining that the overall pace

*Citizen v. Nuclear Regulatory Comm'n*, 845 F.2d 1105, 1108 (D.C. Cir. 1988) ("The agency has

acted . . . [p]etitioners just do not like what the Commission did . . . [a]lmost any objection to an

agency action can be dressed up as an agency's failure to act." ).

<u>CONCLUSION</u>

For the reasons stated above, Defendant EPA's Motion to Dismiss, or in the alternative

for Summary Judgment, is GRANTED, Defendant-Intervenor MAWA's Motion for Summary

Judgment is MOOT, and Plaintiffs' Motion for Summary Judgment is DENIED.  A separate

Order consistent with this Opinion will follow.

Dated: March 31, 2006                          /s/_____
                                               Richard D. Bennett
                                               United States District Judge

of TMDL development in Maryland has increased in the past and will continue to increase in the
future)).

31